UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
----------------------------------X

ALLSTATE INSURANCE COMPANY, an      :
Illinois corporation, as successor
in interest to Northbrook Excess    :
& Surplus Insurance Company,
formerly known as Northbrook        :
Insurance Company, pursuant to
merger effective January 1, 1985,   :    01 Civ. 10715 (HBP)

                    Plaintiff,      :    OPINION
                                         AND ORDER
     -against-                      :

AMERICAN HOME PRODUCTS             :
CORPORATION, a Delaware
corporation,                        :

                    Defendant.      :

----------------------------------X

          PITMAN, United States Magistrate Judge:


I.   Introduction


          This action arises out of a contract dispute between

Allstate Insurance Company ("Allstate") and American Home Prod-

ucts Corporation, now known as Wyeth ("Wyeth").  Both parties

move for summary judgment on the issue of whether Allstate is

obligated under its excess insurance policies to pay the costs of

defending products liability lawsuits brought against Wyeth.  All

parties have consented to my exercising plenary jurisdiction in

the case pursuant to 28 U.S.C. § 636(c).

For the reasons set forth below, Allstate's motion for summary judgment is denied and Wyeth's cross-motion for summary judgment is granted in part and denied in part.

II.  Facts

A.  The Insurance Policies

1.  The Excess Policies

From 1980 to 1984, Wyeth purchased 20% of its first layer of excess products liability insurance from Allstate (Defendant's Statement Pursuant to Local Rule 56.1 in Support of Its Motion for Summary Judgment, dated Mar. 5, 2004 ("Def.'s 56.1") ¶ 2; Responding Statement by Plaintiff Pursuant to Local Rule 56.1 in Opposition to Defendant's Motion for Summary Judgment, dated Apr. 23, 2004 ("Pl.'s Opp. 56.1") ¶ 2; Plaintiff's Rule 56.1 Statement of Uncontested Facts, dated Mar. 5, 2004 ("Pl.'s 56.1") ¶ 23; Wyeth's Responding Statement to Plaintiff's Rule 56.1 Statement of Uncontested Facts, dated Apr. 23, 2004 ("Def.'s Opp. 56.1") ¶ 23).[1]  The material terms and conditions of the excess insurance agreements for the periods from 1980 to

_____

[1]The first layer of excess insurance was coverage that attached after a certain amount of underlying primary insurance had been exhausted, which varied depending on the type of coverage provided (Def.'s 56.1 ¶ 2; Pl.'s Opp. 56.1 ¶ 2).  See In re Sept. 11th Liab. Ins. Coverage, 458 F. Supp.2d 104, 109 nn.2, 3 (S.D.N.Y. 2006) (defining first layer excess insurance).

2

1981 and 1981 to 1984 were set forth in two written insurance
policies (the "Excess Policies") (Stipulation as to Certain
Policies, dated Mar. 5, 2004 ("Stip."), annexed in turn as
Exhibit ("Ex.") 6 to the Declaration of Christopher J. Bannon,
Esq., in Support of Plaintiff's Motion for Summary Judgment,
dated Mar. 5, 2004 ("Bannon Decl.")).  The Excess Policies
provided that Allstate would insure Wyeth against liability to
third parties by increasing the insurance limit of underlying
insurance policies to stated amounts (Northbrook Excess and
Surplus Insurance Company, Excess Liability Coverage Policy
Number 63-006-825, countersigned June 24, 1980 ("1980 Policy") at
NB 00000114, Excess Liability Coverage Policy Number 63-008-121,
countersigned July 13, 1981 ("1981 Policy"), at WYETH 000753,
annexed as Exs. A & B, respectively, to Stip. annexed as Ex. 6 to
Bannon Decl.).  Subject to certain exceptions, the scope of the
coverage Allstate provided to Wyeth was the same as that provided
in the underlying policy, and the increased amount of coverage
was available to Wyeth only after the limits of that underlying
policy were exhausted[2] (1980 Policy at NB 00000114, 1981 Policy

---

[2]Specifically, the Excess Policies provided:

> As respects occurrences taking place during the policy
> period, [Allstate] hereby agrees to afford such
> additional liability insurance as the issuer of the
> Underlying Policy specified below would afford by
> increasing the amount of each Underlying Policy limit
> listed below to the amount shown opposite such
>                                     (continued...)

at WYETH 000753, annexed as Exs. A & B, respectively, to Stip.,
annexed in turn as Ex. 6 to Bannon Decl.).

Under a heading entitled "Maintenance of Underlying
Insurance," the Excess Policies required Wyeth to maintain each
applicable underlying policy "in full effect" as a condition for
Allstate's payment of any claims under the Excess Policies (1980
Policy at NB 00000114, 1981 Policy at WYETH 000753, annexed as
Exs. A & B, respectively, to Stip. annexed as Ex. 6 to Bannon
Decl.).  The Excess Policies also provided:

> This policy is subject to the same warranties, terms
> and conditions (except as regards the premium, the
> obligation to investigate and defend, the amount and
> limits of liability and the renewal agreement, if any,
> and except as otherwise provided herein) as are con-
> tained in or as may be added to the Underlying Policy
> prior to the happening of an occurrence for which claim
> is made . . .

---

[2](...continued)
Underlying Policy limit in the Total Limits column;
PROVIDED that liability shall attach to [Allstate] (a)
only in excess of Underlying Policy coverage which is
subject to a limit listed below, and (b) only after the
issuer of the Underlying Policy had paid or has been
held liable to pay the full amount of the applicable
limit of the said policy, and (c) only as repects such
additional amounts in excess thereof as would be
payable by the issuer of the Underlying Policy if the
said policy were amended as aforesaid

(1980 Policy at NB 00000114, 1981 Policy at WYETH 000753, annexed
as Exs. A & B, respectively, to Stip., annexed in turn as Ex. 6
to Bannon Decl.).

(1980 Policy at NB 00000114, 1981 Policy at WYETH 000753, annexed as Exs. A & B, respectively, to Stip. annexed as Ex. 6 to Bannon Decl. (emphasis added)).

The Excess Policies stated that Wyeth's "Underlying Policy" for the purposes of "Products and Completed Operations Liability" coverage, was a self-insured retention[3] of five million dollars (1980 Policy at NB 00000123, 1981 Policy at WYETH 000758, annexed as Exs. A & B, respectively, to Stip. annexed as Ex. 6 to Bannon Decl.; Pl.'s 56.1 ¶ 13; Def.'s Opp. 56.1 ¶ 13).[4]

---

[3]Where the holder of an excess insurance policy does not purchase underlying primary insurance, the dollar amount of a loss that is retained by the policyholder and not covered by the excess insurance is referred to as a "self-insured retention." The parties may tailor a self-insured retention so that the policyholder only self-insures with respect to "losses," i.e., damage awards or settlement payments, while the excess insurer provides coverage for "loss-adjustment," i.e., the investigation, appraisal, settlement or defense of claims, or for the expenses of loss adjustment. 2 Barry R. Ostrager & Thomas R. Newman, Handbook on Insurance Coverage Disputes § 13.13 at 1088 (14th ed. 2008).

[4]Specifically, the Excess Policies stated, "Underlying Policy: See Endorsement [number] 4" (1980 Policy at NB 00000114, 1981 Policy at WYETH 000753, annexed as Exs. A & B, respectively, to Stip. annexed as Ex. 6 to Bannon Decl.). Endorsement 4, in turn, stated in relevant part:

SCHEDULE OF UNDERLYING POLICIES

Carrier, Policy # & Period
. . . .
2) Self Insured Retention except for the 1st $6,000,000 CSL Foreign which is insured with AFIA

Type of Policy
. . . .

(continued...)

The parties both agree that Wyeth's self-insured retention, in turn, "was deemed to operate in accordance with the terms and conditions of" a policy issued by the Midland Insurance Company to Wyeth for primary coverage for the period from November 1, 1976 to November 1, 1977 (the "Midland Policy") (Def.'s 56.1 ¶ 11; Pl.'s Opp. 56.1 ¶ 11).

   2.   The Midland Policy

      The Midland Policy expressly required Midland to defend Wyeth against lawsuits seeking damages for bodily injury caused by an "occurrence:"

> Midland Insurance Company (. . . herein called the company) . . . agrees with the named insured as fol-lows:

---

   [4](...continued)
      Products and Completed Operations Liability $5,000,000 aggregate (worldwide) including . . . .

      Applicable Limits
      . . . .
      Combined Single Limit For Bodily Injury and Property Damage Combined $5,000,000 each occurrence (where applicable)

(1980 Policy at NB 0000121, 1981 Policy at WYETH 000758, annexed as Exs. A & B, respectively, to Stip. annexed as Ex. 6 to Bannon Decl.).  Neither the parties' briefs nor their Rule 56.1 Statements address the existence or significance of the phrase "except for the 1st $6,000,000 CSL Foreign which is insured with AFIA" in Endorsement 4.  Accordingly, I consider any argument as to this provision to be waived.  Design Strategy, Inc. v. Davis, 469 F.3d 284, 300 (2d Cir. 2006); accord In re Monster Worldwide, Inc. Sec. Litig., 251 F.R.D. 132, 137 (S.D.N.Y. 2008) ("[T]his argument was raised for the first time at oral argument and so was waived in terms of this motion.").

6

*        *        *

>    The company will pay on behalf of the insured all sums
>    which the insured shall become legally obligated to pay
>    as damages because of
>
>         A.  bodily injury or
>
>         B.  property damage
>
>    to which this insurance applies, caused by an occur-
>    rence, and the company shall have the right and duty to
>    defend any suit against the insured seeking damages on
>    account of such bodily injury or property damage, even
>    if any of the allegations of the suit are groundless,
>    false or fraudulent, and may make such investigation
>    and settlement of any claim or suit as it deems expedi-
>    ent, but the company shall not be obligated to pay any
>    claim or judgment or to defend any suit after the
>    applicable limit of the company's liability has been
>    exhausted by payment of judgments or settlements.

(Midland Insurance Company, General Liability-Automobile Policy

No. GL 195558, countersigned Feb. 1, 1977 ("Midland Policy"), at

NBK 0000374, annexed as Ex. C to Stip., annexed in turn as Ex. 6

to Bannon Decl.).[5]

In addition, the Midland Policy included two statements

that explicitly addressed Midland's payment of the expenses of

defending Wyeth.  First, the Midland Policy provided, under the

heading "Supplementary Payments," that Midland would pay all

expenses that it incurred while defending Wyeth, and that these

payments would be incurred "in addition to the applicable limit

---

[5]Although some of the words in the Midland Policy are
illegible in the copies of the Policy offered into evidence, the
parties agree that the text set forth above accurately quotes the
Midland Policy (Pl.'s 56.1 ¶ 8; Def.'s Opp. 56.1 ¶ 8).

of liability," i.e., in addition to Midland's coverage of Wyeth
for liability for damages due to bodily injury and property
damage under the policy (Midland Policy, annexed as Ex. C to
Stip., annexed in turn as Ex. 6 to Bannon Decl. ("The company
will pay, in addition to the applicable limit of liability:  all
expenses incurred by the company, all costs taxed against the
insured in any suit defended by the company and all interest on
the entire amount of any judgment therein which accrues [during a
specified time period].")).  Second, Endorsement 22 to the
Midland Policy granted Midland the "right but not the duty" to
defend Wyeth in certain foreign lawsuits, and that, should
Midland elect not to defend Wyeth in such lawsuits, Midland would
reimburse Wyeth for the reasonable costs of investigating and
defending such suits so long as Midland was given the opportunity
to supervise such investigation and defense:

> If claim is made or suit is brought elsewhere than
> within the United States of America, its territories or
> possessions, or Canada, the Company shall have the
> right but not the duty to investigate and settle such
> claims, and defend such suits.
>
> In any case in which the Company elects not to investi-
> gate, settle or defend, the insured[,] under the super-
> vision of the Company, shall make or cause to be made
> such investigation and defense as are reasonably neces-
> sary and subject to prior authorization by the Company,
> will effect to the extent possible such settlement or
> settlements as the Company and the Insured deem pru-
> dent.  The Company shall reimburse the Insured for
> reasonable costs of such investigation, settlement or
> defense.

(Midland Policy at NBK 0000399, annexed as Ex. C to Stip.,
annexed in turn as Ex. 6 to Bannon Decl.).

   B.   The Products Liability Lawsuits

        Beginning in 1988, Wyeth's insured subsidiary, John
Wyeth & Brother, Ltd., was named as a defendant in more than
11,000 products liability actions filed in the United Kingdom and
Ireland relating to its manufacture and sale of prescription
drugs containing benzodiazepine compounds, including Ativan (the
"Ativan Lawsuits") (Pl.'s 56.1 ¶ 17; Def.'s Opp. 56.1 ¶ 17).  See
John Wyeth & Brother Ltd. v. Cigna Int'l Corp., 119 F.3d 1070,
1071-72 (3d Cir. 1997).  All of the Ativan Lawsuits were resolved
by either a judgment for Wyeth or a discontinuance; Wyeth paid no
judgments to settle the foreign Ativan Lawsuits (Pl.'s 56.1
¶¶ 17, 18; Def.'s Opp. 56.1 ¶¶ 17, 18).[6]  However, Wyeth paid
more than five million dollars in settlements and judgments in
other products liability lawsuits for each of the policy years[7]
covered by the Excess Policies (Complaint for Declaratory Judg-
ment, dated Oct. 18, 2001, annexed as Ex. E to Foresta Decl.,

_____

        [6]Wyeth paid approximately $15,000 to settle an additional
Ativan-related lawsuit brought in the United States (Lenza Dep.
120:20-22:19, annexed as Ex. S to the Declaration of Stephen G.
Foresta, dated Mar. 5, 2004 ("Foresta Decl.")).

        [7]Neither party has explained how it has allocated particular
products liability claims to particular policy years.

¶¶ 13, 21; Answer, dated Nov. 27, 2001, annexed as Ex. F to Foresta Decl., ¶¶ 13, 21).[8]

C.   The Dispute Over Reimbursement

Wyeth has demanded $1,766,955 from Allstate as reimbursement for its expenses in defending the Ativan Lawsuits (Pl.'s 56.1 ¶ 19; Def.'s Opp. 56.1 ¶ 19).  Prior to the Ativan Lawsuits, Allstate had reimbursed Wyeth under the Excess Policies for the expenses of defending other products liability lawsuits. Although Allstate does not admit this fact in its submissions, Allstate's claim examiner and claim director testified to Allstate's prior reimbursement of Wyeth's product liability claims under the Excess Policies; however, they also testified, and Wyeth does not dispute, that Allstate's prior reimbursement of these claims was based on an analysis of the Excess Policies in conjunction with the terms of an agreement other than the Midland Policy (Saam Dep. 125:24-28:13, 129:21-30:8, 144:6-46:10, 291:20-93:7, annexed as Ex. 11 to Bannon Decl.; Hayes Dep. 133:8-

---

[8]In paragraph 21 of its answer to Allstate's state court complaint, Wyeth admitted that its five-million-dollar self-insured retention for products liability claims was exhausted for each of the policy years from July 1981 through July 1984, but denied Allstate's allegation that this exhaustion occurred by means of payment of settlements and judgments.  However, Wyeth later admitted, during a conference call held on March 2, 2009 (the "March Conference Call"), that it had, in fact, exhausted the self-insured retention for each of the covered years by means of payments of settlements and judgments (Transcript of Telephone Conference, Mar. 2, 2009 ("Tr.") 6:18-7:8).

34:9, 137:13-22, 139:21-40:10, 140:21-41:14, annexed as Ex. 17 to
Bannon Decl.; Wyeth's Memorandum of Law in Opposition to
Allstate's Motion for Summary Judgment, dated Apr. 23, 2004
("Def.'s Opp.") 20-21).  After Wyeth submitted its demand for
reimbursement in connection with the Ativan lawsuits, Allstate
took the position that it was not obligated to reimburse Wyeth
for such expenses (Letter from Terry Hayes, Claim Director, to
John E. Wencelblat, American Home Products Corporation, dated
Oct. 19, 2000, annexed as Ex. 18 to Bannon Decl.; Letter from
Terry Hayes, Claim Director, to John E. Wencelblat, American Home
Products Corporation, dated June 25, 2001, annexed as Ex. 20 to
Bannon Decl.).  It is this refusal by Allstate to pay that gives
rise to this action.

    D.   <u>Procedural History</u>

      Allstate commenced this action against Wyeth on October
22, 2001, in New York State Supreme Court, seeking a declaratory
judgment that it was not obligated to reimburse Wyeth for its
expenses in defending the Ativan Lawsuits (Def.'s 56.1 ¶ 5; Pl.'s
Opp. 56.1 ¶ 5).  On November 27, 2001, Wyeth answered Allstate's
complaint, asserted affirmative defenses, sought a declaratory
judgment that Allstate was obligated under the Excess Policies to
reimburse Wyeth for defense expenses associated with the Ativan
Lawsuits, and sought an award of $1,766,955.00, comprising the

total reimbursement due (Def.'s 56.1 ¶ 6; Pl.'s Opp. 56.1 ¶ 6).
Wyeth removed the action to this Court on November 28, 2001
(Def.'s 56.1 ¶ 5; Pl.'s Opp. 56.1 ¶ 7).  On December 5, 2003, the
Honorable Deborah A. Batts, United States District Judge, en-
dorsed an agreement between the parties tolling their respective
claims for reimbursement and damages until a "final and non-
appealable order" [sic] was entered with respect to the parties'
requests for declaratory judgment (Tolling Agreement, Docket Item
18).  The parties completed discovery and, on January 14, 2004,
Judge Batts permitted the parties to file motions for summary
judgment (Order, Docket Item 20).

III.  <u>Analysis</u>

    A.  <u>Jurisdiction and Choice of Law</u>

        Since the Court's subject matter jurisdiction is
predicated on diversity of citizenship, New York's choice-of-law
rules apply to determine what law applies to this matter.  <u>Klaxon
v. Stentor Elec. Mfg. Co.</u>, 313 U.S. 487, 496-97 (1941); <u>Lazard
Freres & Co. v. Protective Life Ins. Co.</u>, 108 F.3d 1531, 1538-39
(2d Cir. 1997).  In contract cases where the relevant agreements
lack a provision setting forth the parties' choice of law, New
York courts apply the law of the forum in which the "center of
gravity" or "grouping of contacts" is located.  <u>Zurich Ins. Co.
v. Shearson Lehman Hutton, Inc.</u>, 84 N.Y.2d 309, 317, 642 N.E.2d

1065, 1068, 618 N.Y.S.2d 608, 609 (1994); accord Lazard Freres & Co. v. Protective Life Ins. Co., supra, 108 F.3d at 1539.

Allstate asserts, and Wyeth does not dispute, that New York law governs the adjudication of the parties' rights and obligations under the Excess Policies (Plaintiff's Memorandum of Law in Support of Motion for Summary Judgment, dated Mar. 5, 2004 ("Pl.'s Br.") 6-8; Def.'s Br. 14).  Both parties rely on New York law and do not claim that the law any other forum applies; "such 'implied consent . . . is sufficient to establish choice of law.'"  Motorola Credit Corp. v. Uzan, 388 F.3d 39, 61 (2d Cir. 2004), quoting Krumme v. WestPoint Stevens, Inc., 238 F.3d 133, 138 (2d Cir. 2000).  Accordingly, New York law applies to this matter.

B.  Legal Principles

1.  Summary Judgment

The standards applicable to a motion for summary judgment are well-settled and require only brief review.

> Summary judgment shall be granted when there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law.  Fed.R.Civ.P. 56(c).  This form of relief is appropriate when, after discovery, the party against whom summary judgment is sought has not shown that evidence of an essential element of her case -- one on which she has the burden of proof -- exists.  See Celotex Corp. v. Catrett, 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). This form of remedy is inappropriate when the issue to be resolved is both genuine and related to a disputed

material fact.  An alleged factual dispute regarding immaterial or minor facts between the parties will not defeat an otherwise properly supported motion for summary judgment.  See Howard v. Gleason Corp., 901 F.2d 1154, 1159 (2d Cir. 1990).  Moreover, the existence of a mere scintilla of evidence in support of nonmovant's position is insufficient to defeat the motion; there must be evidence on which a jury could reasonably find for the nonmovant.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 252, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

   If the movant demonstrates an absence of a genuine issue of material fact, a limited burden of production shifts to the nonmovant, who must "demonstrate more than some metaphysical doubt as to the material facts," and come forward with "specific facts showing that there is a genuine issue for trial."  Aslanidis v. United States Lines, Inc., 7 F.3d 1067, 1072 (2d Cir. 1993).  If the non-movant fails to meet this burden, summary judgment will be granted against it.

Powell v. Nat'l Bd. of Med. Exam'rs, 364 F.3d 79, 84 (2d Cir. 2004); accord Binder & Binder PC v. Barnhart, 481 F.3d 141, 148 (2d Cir. 2007); Jeffreys v. City of New York, 426 F.3d 549, 553-54 (2d Cir. 2005); Gallo v. Prudential Residential Servs., Ltd., 22 F.3d 1219, 1223-24 (2d Cir. 1994); see also McPherson v. New York City Dep't of Educ., 457 F.3d 211, 215 n.4 (2d Cir. 2006) ("[S]peculation alone is insufficient to defeat a motion for summary judgment.").

   The party seeking summary judgment has the burden to demonstrate that no genuine issue of material fact exists . . . .  In determining whether a genuine issue of material fact exists, a court must examine the evidence in the light most favorable to, and draw all inferences in favor of, the non-movant . . . .  Stated more succinctly, "[t]he evidence of the non-movant is to be believed."

14

Lucente v. Int'l Bus. Machs. Corp., 310 F.3d 243, 253-54 (2d Cir. 2002) (citations omitted); accord Jeffreys v. City of New York, supra, 426 F.3d at 553 ("Assessments of credibility and choices between conflicting versions of the events are matters for the jury, not for the court on summary judgment.")(citations omitted); see also Make the Road by Walking, Inc. v. Turner, 378 F.3d 133, 142 (2d Cir. 2004).

    2.  Contract Interpretation

       "The primary objective of a court in interpreting a contract is to give effect to the intent of the parties as revealed by the language of their agreement." Consub Delaware LLC v. Schahin Engenharia Limitada, 543 F.3d 104, 113 (2d Cir. 2008); accord W.W.W. Assocs., Inc. v. Giancontieri, 77 N.Y.2d 157, 162, 566 N.E.2d 639, 642, 565 N.Y.S.2d 440, 443 (1990). "A contract should be construed so as to give full meaning and effect to all of its provisions." Am. Express Bank Ltd. v. Uniroyal, Inc., 164 A.D.2d 275, 277, 562 N.Y.S.2d 613, 614 (1st Dep't 1990), appeal denied, 77 N.Y.2d 807, 572 N.E.2d 52, 569 N.Y.S.2d 611 (1991); accord Parks Real Estate Purch. Group v. St. Paul Fire & Marine Ins. Co., 472 F.3d 33, 42 (2d Cir. 2006). "[T]he initial interpretation of a contract is a matter of law for the court to decide," Morgan Stanley Group Inc. v. New Eng. Ins. Co., 225 F.3d 270, 275 (2d Cir. 2000), and summary judgment

is appropriate where the language of the contract is "wholly unambiguous." Mellon Bank, N.A. v. United Bank Corp., 31 F.3d 113, 115 (2d Cir. 1994); see also Asheville Mica Co. v. Commodity Credit Corp., 335 F.2d 768, 770 (2d Cir. 1964).

> Whether a contract [provision] is ambiguous, however, is a "threshold question of law to be determined by the court." Duane Reade Inc. v. St. Paul Fire and Marine Ins. Co., 411 F.3d 384, 390 (2d Cir. 2005); see also Morgan Stanley Group, Inc., 225 F.3d at 275 ("Part of this threshold interpretation is the question of whether the terms of the insurance contract are ambiguous." (citing Alexander & Alexander Servs., Inc. v. These Certain Underwriters at Lloyd's, 136 F.3d 82, 86 (2d Cir. 1998))).  "An ambiguity exists where the terms of an insurance contract could suggest 'more than one meaning when viewed objectively by a reasonably intelligent person who has examined the context of the entire integrated agreement and who is cognizant of the customs, practices, usages and terminology as generally understood in the particular trade or business.'" Morgan Stanley Group Inc., 225 F.3d at 275 (quoting Lightfoot v. Union Carbide Corp., 110 F.3d 898, 906 (2d Cir. 1997)); see also Duane Reade Inc., 411 F.3d at 390 (quoting Morgan Stanley Group Inc. for same).  "An insurance policy should be read in light of common speech and the reasonable expectations of a businessperson." Pepsico, Inc. v. Winterthur Int'l Am. Ins. Co., 13 A.D.3d 599, 788 N.Y.S.2d 142, 144 (N.Y. App. Div. [2d Dep't] 2004) (internal quotation marks omitted); accord Throgs Neck Bagels, Inc. v. GA Ins. Co. of N.Y., 241 A.D.2d 66, 671 N.Y.S.2d 66, 68-69 (N.Y. App. Div. 1998) (stating that courts are to construe the terms of an insurance contract as they are used in common speech).

Parks Real Estate Purch. Group v. St. Paul Fire & Marine Ins. Co., supra, 472 F.3d at 42.

In determining whether a contract provision is ambiguous, extrinsic evidence, such as the conduct of the parties, may not be considered.  Bailey v. Fish & Neave, 8 N.Y.3d 523, 528,

868 N.E.2d 956, 959, 837 N.Y.S.2d 600, 603 (2007); accord South

Road Assocs., LLC v. Int'l Bus. Mach. Corp., 4 N.Y.3d 272, 278,

826 N.E.2d 806, 809, 793 N.Y.S.2d 835, 838 (2005).

> A contract [provision] is not ambiguous "simply because
> the parties urge different interpretations," or if one
> side's reading "strain[s] the contract language beyond
> its reasonable and ordinary meaning."  Simply put, a
> contract [provision] is not ambiguous where it "has a
> definite meaning, and where no reasonable basis exists
> for a difference of opinion about that meaning."

Union Switch & Signal, Inc. v. City of New York, 92 Civ. 6771

(MGC), 1994 WL 570789 at *3 (S.D.N.Y. Oct. 17, 1994) (internal

citations omitted), quoting Seiden Assocs., Inc. v. ANC Holdings,

Inc., 959 F.2d 425, 428 (2d Cir. 1992), and Brass v. Am. Film

Techs., Inc., 987 F.2d 142, 148 (2d Cir. 1993).


    C.   The Parties' Arguments

        1.   Existence of a Duty to
            Reimburse Defense Expenses

The first issue to be decided is whether the Midland

Policy as applied to Allstate unambiguously would impose liabil-

ity on Allstate for the payment of any of Wyeth's defense ex-

penses and, if so, whether the provisions of the Excess Policies

relieve Allstate of that liability.  While Wyeth admits that the

Excess Policies relieve Allstate of any duty to defend Wyeth,

Wyeth nevertheless claims that the Excess Policies do not relieve

Allstate of its obligation to reimburse Wyeth's defense expenses

with respect to the Ativan Lawsuits, which arise out of two other provisions in the Midland Policy.

        i.  The Supplementary
            Payment Provision

        The Supplementary Payment provision of the Midland Policy (the "S.P. Provision") obligates the insurer to "pay, in addition to the applicable limit of liability[,] all expenses incurred by the company, [and] all costs taxed against the insured in any suit defended by the company . . ." (Midland Policy at NBK 0000372, annexed as Ex. C to Stip., annexed in turn as Ex. 6 to Bannon Decl.).  Wyeth argues that the S.P. Provision creates an obligation on the part of Allstate to pay all expenses incurred by <u>Wyeth</u> in the event that Wyeth, rather than Allstate, defends a suit covered by the Midland Policy (Def.'s Br. 17-18; Def.'s Opp. 15).  However, the Midland Policy defines "the company" to mean the insurer, Midland, not the insured (Midland Policy at NBK 0000374, annexed as Ex. C to Stip., annexed in turn as Ex. 6 to Bannon Decl. ("Midland Insurance Company (. . . herein called the company) . . . agrees with the named insured as follows: . . . .")).  Thus, the Policy provides that the insurer, whatever its identity, will pay <u>its</u> <u>own</u> expenses in the lawsuits that <u>it</u> defends.  As a result, for the purposes of the underlying self-insurance, the S.P. Provision unambiguously provides that Wyeth, as the self-insurer of its own first five million dollars

18

in liability, is obligated to pay its own expenses.  Likewise, for the purposes of the Excess Policies, the S.P. Provision states that Allstate, as the insurer, is obligated to pay its own expenses in suits defended by Allstate.  Therefore, with respect to claims against which Wyeth defended itself in a suit covered by the Midland Policy, Allstate is not obligated to reimburse Wyeth's defense expenses under the S.P. Provision.

### ii.   Endorsement 22

Wyeth also claims that Endorsement 22 to the Midland Policy operates to require Allstate to reimburse Wyeth for defense expenses.  Wyeth argues that the Endorsement "speaks specifically about those cases in which the insurer does not defend Wyeth and states that even in those cases, the insurer 'shall reimburse' defense costs" (Def.'s Opp. 15; see also Def.'s Br. 18).  Allstate responds that the Endorsement relieves the insurer of part of its preexisting duty to defend the insured and instead, substitutes a duty to reimburse; Allstate further argues that because the Excess Policies exclude any duty to defend, Endorsement 22 does not apply to it (Def.'s Opp. 9-10).[9]

Where, as here, an insurance policy subjects an excess insurer to the terms of a underlying policy, the obligations of

---

[9]Allstate clarified its argument regarding this issue during the March Conference Call (Tr. 14:4-17:24).

the excess insurer are defined by the language of the underlying policy, except to the extent that there is a conflict between the policies or an express exclusion in the excess policy.  Home Ins. Co. v. Am. Home Prods. Corp., 902 F.2d 1111, 1113 (2d Cir. 1990). Because the parties agree that the Midland Policy supplies the terms and conditions of the self-insured retention, which is the underlying policy for the purposes of Allstate's Excess Policies, Allstate's obligations under the Excess Policies are defined by the language of the Midland Policy, except to the extent that there is a conflict between the Midland Policy and the Excess Policies.

Endorsement 22 neither conflicts with nor is excluded by the Excess Policies.  The Endorsement states that "the [insurer] shall have the right but not the duty to investigate and . . . defend" claims and lawsuits "brought elsewhere than within the United States of America, its territories or possessions, or Canada" ("foreign" claims and lawsuits) (Midland Policy at NBK 0000399, annexed as Ex. C to Stip., annexed in turn as Ex. 6 to Bannon Decl. (emphasis added)).  If the insurer elects not to defend, Endorsemenet 22 further provides that if the insured investigates, settles or defends the claim under the supervision of the insurer, the insurer shall reimburse the reasonable costs of such investigation, settlement or defense.  The language of the Endorsement is clear:  it creates a right on the part of the

insurer to investigate and defend foreign claims and lawsuits and
an obligation to indemnify with respect to such claims and
lawsuits if the insurer elects not to defend.  The language of
the Excess Policies is equally clear:  it excludes "the obliga-
tion to investigate and defend" all claims or lawsuits, foreign
or domestic (1980 Policy at NB 00000114, 1981 Policy at WYETH
000753, annexed as Exs. A & B, respectively, to Stip. annexed as
Ex. 6 to Bannon Decl. (stating that the Excess Policies are
"subject to the same warranties, terms and conditions (<u>except</u> <u>as</u>
<u>regards</u> . . . <u>the</u> <u>obligation</u> <u>to</u> <u>investigate</u> <u>and</u> <u>defend</u> . . . and
except as otherwise provided herein) as are contained in" the
self-insured retention (emphasis added))).  Although the Midland
Policy imposed both "the right and duty to defend any [law]suit
against the insured" (Midland Policy at NBK 0000374, annexed as
Ex. C to Stip., annexed in turn as Ex. 6 to Bannon Decl.), the
Excess Policies excluded only the duty, but not the right, to
defend such lawsuits.

        Allstate argues that Endorsement 22 operates as a
limitation on a general duty to defend lawsuits covered by the
policy and that, because it has excluded any such duty to defend,
the Endorsement has no effect.  Allstate's argument is not
supported by controlling precedent.  The Excess Policies exclude
"the obligation to investigate and defend" (1980 Policy at NB
00000114, 1981 Policy at WYETH 000753, annexed as Exs. A & B,

respectively, to Stip. annexed as Ex. 6 to Bannon Decl.).  The
duty imposed by Endorsement 22 is a duty, under certain circum-
stances, to indemnify Wyeth for the costs of investigating,
settling or defending against certain claims.  The duty to defend
is, however, distinct from the duty to indemnify for defense
costs and an excess insurer's exclusion of an obligation to
defend does not override other policy provisions creating a duty
to indemnify defense costs.  Stonewall Ins. Co. v. Asbesos Claims
Mgmt. Corp., 73 F.3d 1178, 1218 (2d Cir. 1995) (granting summary
judgment in favor of insured and against excess insurer where
excess policies excluded obligation to assume insured's defense
and concluding that duty to defend is distinct from the duty to
pay defense costs); see North River Ins. Co. v. Cigna Reins Co.,
51 F.3d 1194, 1120 (3rd Cir. 1995) (fact that underlying insurer
is obligated to defend "does not compel the conclusion that the
insured also intended to relieve the excess insurer of all
liability for defense costs accrued in excess of the primary
insurer's limits -- especially when such costs would be incurred
in an effort to avoid liability that the excess insurer would
have to pay").

        Here, the Midland Policy imposed two separate duties on
the insurer:  (1) the duty to defend the insured and (2) the duty
to reimburse the insured for the reasonable expenses of defending
foreign lawsuits under certain circumstances.  The Excess Poli-

cies expressly eliminated only the former duty.  Stonewall teaches that this exclusion does not, without more, eliminate the independent duty to reimburse certain defense expenses imposed by Endorsement 22.  Thus, Endorsement 22 imposes a duty on Allstate to reimburse Wyeth's costs of defending foreign lawsuits under the stated circumstances, and the Excess Policies fully incorporate this duty.

        2.   Attachment of the
             Duty to Reimburse
             Defense Expenses

        Having determined that Allstate is responsible for certain defense costs, it is necessary to resolve when Allstate's duty to reimburse these costs attached.  Wyeth claims that Allstate's duty to reimburse Wyeth's defense expenses attached at the same time as Allstate's duty to pay Wyeth's judgments for damages attached, i.e., when Wyeth had paid five million dollars in products liability settlements or judgments attributable to a given policy year (Def.'s Opp. 10).[10]  Allstate has not rebutted Wyeth's argument.[11]

---

        [10]Wyeth further explained this aspect of its argument during the March Conference Call (Tr. 3:24-6:17).

        [11]During the March Conference Call, Allstate argued for the first time that its liability under the Excess Policies did not attach until after Wyeth had exhausted both its self-insured retention and a six million dollar AFIA "CSL Foreign" policy mentioned in Endorsement 4 to the Excess Policies (Tr. 11:8-
                                                    (continued...)

Allstate owed no duty to Wyeth under the Excess Poli-
cies until Wyeth's self-insured retention was exhausted (1980
Policy at NB 00000114, 1981 Policy at WYETH 000753, annexed as
Exs. A & B, respectively, to Stip. annexed as Ex. 6 to Bannon
Decl. ("[L]iability shall attach to [Allstate] . . . only after
the issuer of the Underlying Policy ha[s] paid or has been held
liable to pay the full amount of the applicable limit of the said
policy . . . .")).  At that point, the Excess Policies obligated
Allstate to reimburse the costs of defending foreign lawsuits in
accordance with Endorsement 22 and to indemnify Wyeth against
judgments or settlements in accordance with the limits of the
Excess Policies[12] (1980 Policy at NB 00000114, 1981 Policy at

_____

[11](...continued)
12:13).  As noted above at note 4, because Allstate failed to
raise that argument or even mention the AFIA policy in its briefs
or Rule 56.1 Statements, I conclude this argument is waived.

[12]The parties dispute the limit of Allstate's duty to
reimburse defense expenses.  Allstate argued during the March
Conference Call and in its reply brief that any reimbursement
payments made pursuant to Endorsement 22 under the Midland Policy
must be charged against Allstate's liability limit under the
Excess Policies of five million dollars per policy year (Tr.
10:1-10:10; Pl.'s Reply 4 n.2).  Wyeth denies that contention and
argues that the Excess Policies do not limit Allstate's duty to
reimburse Wyeth for defense expenses except that Allstate's duty
to reimburse defense expenses ceases when Allstate has paid five
million dollars in settlements or judgments (Def.'s Opp. 10).
This dispute is not yet ripe for adjudication because the amount
of Ativan defense expenses at issue during the years covered by
the Excess Policies appears to be well under the Excess Policies'
five-million-dollar limit, and neither party has offered evidence
concerning the extent to which Allstate otherwise exhausted its
five-million-dollar limit.

WYETH 000753, annexed as Exs. A & B, respectively, to Stip. annexed as Ex. 6 to Bannon Decl. ("[Allstate] hereby agrees to afford such additional liability insurance as the issuer of the Underlying Policy specified below would afford . . . in excess of Underlying Policy coverage which is subject to a limit listed below . . . ."). Therefore, Wyeth was responsible for all of its own defense expenses until it paid at least five million dollars in judgments or settlements; Allstate's duty to reimburse Wyeth certain of Wyeth's defense expenses attached at that point.

>           3.   Whether the Requirements
>                of Endorsement 22 Were Met

Endorsement 22 does not impose an unqualified duty to reimburse Wyeth's defense costs. Rather, with respect to claims made or suits brought outside of the United States, its territories or possessions and Canada, Allstate is obligated to reimburse the reasonable defense costs with respect to cases in which "the insured[,] under the supervision of [Allstate], shall make or cause to be made such investigation and defense as are reasonably necessary . . ." (Midland Policy at NBK 0000399, annexed as Ex. C to Stip., annexed in turn as Ex. 6 to Bannon Decl.). Thus, the reimbursement obligation is limited to matters in which Allstate supervises or is, at least, given the opportunity to supervise the investigation or defense.

Although there is evidence currently in the record
before me that suggests with some force that Allstate was given
this opportunity, Wyeth did not expressly argue in its motion
that it was entitled to summary judgment on this matter and,
thus, it is not clear that Allstate was on notice that this
particular matter was in issue.  Accordingly, I believe it would
be inappropriate to resolve this issue on the record currently
before me.

D.   Summary

In sum, the parties are in agreement that Allstate's
obligations under the Excess Policies are defined by the language
of the Midland Policy, except to the extent that the Excess
Policies exclude or conflict with that language.  Wyeth has
sustained its burden of proving that there is no genuine issue of
fact that the terms of the Midland Policy obligate Allstate to
reimburse Wyeth's defense expenses under the conditions set forth
in Endorsement 22, and that the Excess Policies do not exclude or
conflict with this obigation.  Allstate has not come forward with
specific facts showing that there is a genuine issue for trial as
to the existence of this obligation.  Furthermore, Wyeth has
shown, and Allstate has not given cause to doubt, that Allstate's
obligation pursuant to Endorsement 22 attached when Wyeth ex-
hausted its payment of five million dollars in settlements or

judgments attributable to a particular policy year.  However, a genuine issue of fact remains as to whether the conditions for the payment of defense expenses imposed by Endorsement 22 were met in this case.

IV.   <u>Conclusion</u>

Accordingly, for all the foregoing reasons, Allstate's motion for summary judgment is denied, and Wyeth's cross-motion for summary judgment is granted in part and denied in part. Counsel are directed to report for a status conference on April 20, 2009 at 2:00 p.m. in Courtroom 18A, United States Courthouse, 500 Pearl Street, New York, New York 10007.

Dated:   New York, New York
         March 31, 2009

                              SO ORDERED


                              HENRY PITMAN
                              United States Magistrate Judge


Copies transmitted to:

Christopher J. Bannon, Esq.
Aronberg Goldgehn Davis & Garmisa
Suite 3000
One IBM Plaza
Chicago, Illinois  60611

Stephen G. Foresta, Esq.
666 Fifth Avenue
New York, New York  10103

27